Justice Stevens,
dissenting.
In District of Columbia v. Heller, 554 U. S. 570, 573 (2008), the Court answered the question whether a federal enclave’s “prohibition on the possession of usable handguns in the home violates the Second Amendment to the Constitution.” The question we should be answering in this case is whether the Constitution “guarantees individuals a fundamental right,” enforceable against the States, “to possess a functional, personal firearm, including a handgun, within the home.” Complaint ¶34, App. 23. That is a different— and more difficult — inquiry than asking if the Fourteenth Amendment “incorporates” the Second Amendment. The *859 so-called incorporation question wás squarely and, in my view, correctly resolved in the late 19th century.[1]
Before the District Court, petitioners focused their pleadings on the special considerations raised by domestic possession, which they identified as the core of their asserted right. In support of their claim that the city of Chicago’s handgun ban violates the Constitution, they now rely primarily on the Privileges or Immunities Clause of the Fourteenth Amendment. See Brief for Petitioners 9-65. They rely secondarily on the Due Process Clause of that Amendment. See id., at 66-72. Neither submission requires the Court to express an opinion on whether the Fourteenth Amendment places any limit on the power of States to regulate possession, use, or carriage of firearms outside the home.
I agree with the plurality’s refusal to accept petitioners’ primary submission. Ante, at 758. Their briefs marshal an impressive amount of historical evidence for their argument that the Court interpreted the Privileges or Immunities Clause too narrowly in the Slaughter-House Cases, 16 Wall. 36 (1873). But the original meaning of the Clause is not as clear as they suggest[2] — and not nearly as clear as it would *860 need to be to dislodge 137 years of precedent. The burden is severe for those who seek radical change in such an established body of constitutional doctrine.[3] Moreover, the suggestion that invigorating the Privileges or Immunities Clause will reduce judicial discretion, see Reply Brief for Petitioners 22, n. 8, 26; Tr. of Oral Arg. 64-65, strikes me as implausible, if not exactly backwards. “For the very reason that it has so long remained a clean slate, a revitalized Privileges or Immunities Clause holds special hazards for judges who are mindful that their proper task is not to write their personal views, of appropriate public policy into the Constitution.”[4]
I further agree with the plurality that there are weighty arguments supporting petitioners’ second submission, insofar as it concerns the possession of firearms for lawful self-defense in the home. But these arguments are less compelling than the plurality suggests; they are much less *861 compelling when applied outside the home; and their validity-does not depend on the Court’s holding in Heller. For that holding sheds no light on the meaning of the Due Process Clause of the Fourteenth Amendment. Our decisions construing that Clause to render various procedural guarantees in the Bill of Rights enforceable against the States likewise tell us little about the meaning of the word “liberty” in the Clause or about the scope of its protection of nonprocedural rights.
This is a substantive due process case.
I
Section 1 of the Fourteenth Amendment decrees that no State shall “deprive any person of life, liberty, or property, without due process of law.” The Court has filled thousands of pages expounding that spare text. As I read the vast corpus of substantive due process opinions, they confirm several important principles that ought to guide our resolution of this case. The principal opinion’s lengthy summary of our “incorporation” doctrine, see ante, at 754-758, 759-766 (majority opinion), 758-759 (plurality opinion), and its implicit (and untenable) effort to wall off that doctrine from the rest of our substantive due process jurisprudence, invite a fresh survey of this old terrain.

Substantive Content

The first, and most basic, principle established by our cases is that the rights protected by the Due Process Clause are not merely procedural in nature. At first glance, this proposition might seem surprising, given that the Clause refers to “process.” But substance and procedure are often deeply entwined. Upon closer inspection, the text can be read to “imposte] nothing less than an obligation to give substantive content to the words ‘liberty’ and ‘due process of law,’” Washington v. Glucksberg, 521 U. S. 702, 764 (1997) (Souter, J., concurring in judgment), lest superficially fair procedures be permitted to “destroy the enjoyment” of life, liberty, and *862 property, Poe v. Ullman, 367 U. S. 497, 541 (1961) (Harlan, J., dissenting), and the Clause’s prepositional modifier be permitted to swallow its primary command. Procedural guarantees are hollow unless linked to substantive interests; and no amount of process can legitimize some deprivations.
I have yet to see a persuasive argument that the Framers of the Fourteenth Amendment thought otherwise. To the contrary, the historical evidence suggests that, at least by the time of the Civil War if not much earlier, the phrase “due process of law” had acquired substantive content as a term of art within the legal community.[5] This understanding is *863 consonant with the venerable “notion that governmental authority has implied limits which preserve private autonomy,” [6] a notion which predates the founding and which finds reinforcement in the Constitution’s Ninth Amendment, see Griswold v. Connecticut, 381 U. S. 479, 486-493 (1965) (Goldberg, J., concurring).[7] The Due Process Clause cannot claim to be the source of our basic freedoms — no legal document ever could, see Meachum v. Fano, 427 U. S. 215, 230 (1976) (Stevens, J., dissenting) — but it stands as one of their foundational guarantors in our law.
If text and history are inconclusive on this point, our precedent leaves no doubt: It has been “settled” for well over a century that the Due Process Clause “applies to matters of substantive law as well as to matters of procedure.” Whitney v. California, 274 U. S. 357, 373 (1927) (Brandéis, J., concurring). Time and again, we have recognized that in the Fourteenth Amendment as well as the Fifth, the “Due Process Clause guarantees more than fair process, and the 'liberty’ it protects includes more than the absence of physical restraint.” Glucksberg, 521 U. S., at 719. “The Clause also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.’” Troxel v. Granville, 530 U. S. 57, 65 (2000) (plurality opinion of O’Connor, J., joined by Rehnquist, C. J., and Ginsburg and Breyer, JJ.) (quoting Glucksberg, 521 U. S., at 720). Some of our most enduring precedents, accepted today by virtually everyone, were substantive due process decisions. See, e. g., Loving v. Virginia, 388 U. S. 1, 12 (1967) (recognizing due-process-as well as equal-protection-based right to marry person of another race); Bolling v. Sharpe, 347 U. S. 497, 499-500 (1954) (outlawing racial segregation in District of Colum *864 bia public schools); Pierce v. Society of Sisters, 268 U. S. 510, 534-535 (1925) (vindicating right of parents to direct upbringing and education of their children); Meyer v. Nebraska, 262 U. S. 390, 399-403 (1923) (striking down prohibition on teaching of foreign languages).

Liberty

The second principle woven through our cases is that substantive due process is fundamentally a matter of personal liberty. For it is the liberty clause of the Fourteenth Amendment that grounds our most important holdings in this field. It is the liberty clause that enacts the Constitution’s “promise” that a measure of dignity and self-rule will be afforded to all persons. Planned Parenthood of Southeastern Pa. v. Casey, 505 U. S. 833, 847 (1992). It is the liberty clause that reflects and renews “the origins of the American heritage of freedom [and] the abiding interest in individual liberty that makes certain state intrusions on the citizen’s right to decide how he will live his own life intolerable.” Fitzgerald v. Porter Memorial Hospital, 523 F. 2d 716, 720 (CA7 1975) (Stevens, J.). Our substantive due process cases have episodically invoked values such as privacy and equality as well, values that in certain contexts may intersect with or complement a subject’s liberty interests in profound ways. But as I have observed on numerous occasions, “most of the significant [20th-century] cases raising Bill of Rights issues have, in the final analysis, actually interpreted the word 'liberty’ in the Fourteenth Amendment.”[8]
It follows that the term “incorporation,” like the term “unenumerated rights,” is something of a misnomer. Whether an asserted substantive due process interest is explicitly *865 named in one of the first eight Amendments to the Constitution or is not mentioned, the underlying inquiry is the same: We must ask whether the interest is “comprised within the term liberty.” Whitney, 274 U. S., at 373 (Brandeis, J., concurring). As the second Justice Harlan has shown, ever since the Court began considering the applicability of the Bill of Rights to the States, “the Court’s usual approach has been to ground the prohibitions against state action squarely on due process, without intermediate reliance on any of the first eight Amendments.” Malloy v. Hogan, 378 U. S. 1, 24 (1964) (dissenting opinion); see also Frankfurter, Memorandum on “Incorporation” of the Bill of Rights into the Due Process Clause of the Fourteenth Amendment, 78 Harv. L. Rev. 746, 747-750 (1965). In the pathmarking case of Git-low v. New York, 268 U. S. 652, 666 (1925), for example, both the majority and dissent evaluated petitioner’s free speech claim not under the First Amendment but as an aspect of “the fundamental personal rights and 'liberties’ protected by the due process clause of the Fourteenth Amendment from impairment by the States.”[9]
*866 In his own classic opinion in Griswold, 381 U. S., at 500 (opinion concurring in judgment), Justice Harlan memorably distilled these precedents’ lesson: “While the relevant inquiry may be aided by resort to one or more of the provisions of the Bill of Rights, it is not dependent on them or any of their radiations. The Due Process Clause of the Fourteenth Amendment stands ... on its own bottom.”[10] Inclusion in the Bill of Rights is neither necessary nor sufficient for an interest to be judicially enforceable under the Fourteenth Amendment. This Court’s “‘selective incorporation’” doctrine, ante, at 763, is not simply “related” to substantive due process, ante, at 767; it is a subset thereof.

Federal/State Divergence

The third precept to emerge from our case law flows from the second: The rights protected against state infringement by the Fourteenth Amendment’s Due Process Clause need not be identical in shape or scope to the rights protected against Federal Government infringement by the various provisions of the Bill of Rights. As drafted, the Bill of Rights directly constrained only the Federal Government. See Barron ex rel. Tiernan v. Mayor of Baltimore, 7 Pet. 243 (1833). Although the enactment of the Fourteenth *867 Amendment profoundly altered our legal order, it “did not unstitch the basic federalist pattern woven into our constitutional fabric.” Williams v. Florida, 399 U. S. 78, 133 (1970) (Harlan, J., concurring in result). Nor, for that matter, did it expressly alter the Bill of Rights. The Constitution still envisions a system of divided sovereignty, still “establishes a federal republic where local differences are to be cherished as elements of liberty” in the vast run of cases, National Rifle Assn. of Am. Inc. v. Chicago, 567 F. 3d 856, 860 (CA7 2009) (Easterbrook, C. J.), still allocates a general “police power ... to the States and the States alone,” United States v. Comstock, 560 U. S. 126, 153 (2010) (Kennedy, J., concurring in judgment). Elementary considerations of constitutional text and structure suggest there may be legitimate reasons to hold state governments to different standards than the Federal Government in certain areas.[11]
It is true, as the Court emphasizes, ante, at 763-766, that we have made numerous provisions of the Bill of Rights fully applicable to the States. It is settled, for instance, that the Governor of Alabama has no more power than the President of the United States to authorize unreasonable searches and seizures. Ker v. California, 374 U. S. 23 (1963). But we have never accepted a “'total incorporation’” theory of the Fourteenth Amendment, whereby the Amendment is deemed to subsume the provisions of the Bill of Rights en masse. See ante, at 763. And we have declined to apply several provisions to the States in any measure. See, e. g., Minneapolis & St. Louis R. Co. v. Bombolis, 241 U. S. 211 (1916) (Seventh Amendment); Hurtado v. California, 110 U. S. 516 (1884) (Grand Jury Clause). We have, moreover, resisted a uniform approach to the Sixth Amendment’s criminal jury guarantee, demanding 12-member panels and unani *868 mous verdicts in federal trials, yet not in state trials. See Apodaca v. Oregon, 406 U. S. 404 (1972); Williams, 399 U. S. 78. In recent years, the Court has repeatedly declined to grant certiorari to review that disparity.[12] While those denials have no precedential significance, they confirm the proposition that the “incorporation” of a provision of the Bill of Rights into the Fourteenth Amendment does not, in itself, mean the provision must have precisely the same meaning in both contexts.
It is true, as well, that during the 1960’s the Court decided a number of cases involving procedural rights in which it treated the Due Process Clause as if it transplanted language from the Bill of Rights into the Fourteenth Amendment. See, e. g., Benton v. Maryland, 395 U. S. 784, 795 (1969) (Double Jeopardy Clause); Pointer v. Texas, 380 U. S. 400, 406 (1965) (Confrontation Clause). “Jot-for-jot” incorporation was the norm in this expansionary era. Yet at least one subsequent opinion suggests that these precedents require perfect state/federal congruence only on matters “'at the core’” of the relevant constitutional guarantee. Crist v. Bretz, 437 U. S. 28, 37 (1978); see also id., at 52-53 (Powell, J., dissenting). In my judgment, this line of cases is best understood as having concluded that, to ensure a criminal trial satisfies essential standards of fairness, some procedures should be the same in state and federal courts: The need for certainty and uniformity is more pressing, and the margin for error slimmer, when criminal justice is at issue. That principle has little relevance to the question whether a %o%-procedural rule set forth in the Bill of Rights qualifies *869 as an aspect of the liberty protected by the Fourteenth Amendment.
Notwithstanding some overheated dicta in Malloy, 378 U. S., at 10-11, it is therefore an overstatement to say that the Court has “abandoned,” ante, at 764, 765 (majority opinion), 786 (plurality opinion), a “two-track approach to incorporation,” ante, at 784 (plurality opinion). The Court moved away from that approach in the area of criminal procedure. But the Second Amendment differs in fundamental respects from its neighboring provisions in the Bill of Rights, as I shall explain in Part V, infra; and if some 1960’s opinions purported to establish a general method of incorporation, that hardly binds us in this case. The Court has not hesitated to cut back on perceived Warren Court excesses in more areas than I can count.
I do not mean to deny that there can be significant practical, as well as esthetic, benefits from treating rights symmetrically with regard to the State and Federal Governments. Jot-for-jot incorporation of a provision may entail greater protection of the right at issue and therefore greater freedom for those who hold it; jot-for-jot incorporation may also yield greater clarity about the contours of the legal rule. See Johnson v. Louisiana, 406 U. S. 356, 384-388 (1972) (Douglas, J., dissenting); Pointer, 380 U. S., at 413-414 (Goldberg, J., concurring). In a federalist system such as ours, however, this approach can carry substantial costs. When a federal court insists that state and local authorities follow its dictates on a matter not critical to personal liberty or procedural justice, the latter may be prevented from engaging in the kind of beneficent “experimentation in things social and economic” that ultimately redounds to the benefit of all Americans. New State Ice Co. v. Liebmann, 285 U. S. 262, 311 (1932) (Brandéis, J., dissenting). The costs of federal courts’ imposing a uniform national standard may be especially high when the relevant regulatory interests vary *870 significantly across localities, and when the ruling implicates the States’ core police powers.
Furthermore, there is a real risk that, by demanding the provisions of the Bill of Rights apply identically to the States, federal courts will cause those provisions to “be watered down in the needless pursuit of uniformity.” Duncan v. Louisiana, 391 U. S. 145, 182, n. 21 (1968) (Harlan, J., dissenting). When one legal standard must prevail across dozens of jurisdictions with disparate needs and customs, courts will often settle on a relaxed standard. This watering-down risk is particularly acute when we move beyond the narrow realm of criminal procedure and into the relatively vast domain of substantive rights. So long as the requirements of fundamental fairness are always and everywhere respected, it is not clear that greater liberty results from the jot-for-jot application of a provision of the Bill of Rights to the States. Indeed, it is far from clear that proponents of an individual right to keep and bear arms ought to celebrate today’s decision.[13]
*871 II
So far, I have explained that substantive due process analysis generally requires us to consider the term “liberty” in the Fourteenth Amendment, and that this inquiry may be informed by, but does not depend upon, the content of the Bill of Rights. How should a court go about the analysis, then? Our precedents have established, not an exact methodology, but rather a framework for decisionmaking. In this respect, too, the Court’s narrative fails to capture the continuity and flexibility in our doctrine.
The basic inquiry was described by Justice Cardozo more than 70 years ago. When confronted with a substantive due process claim, we must ask whether the allegedly unlawful practice violates values “implicit in the concept of ordered liberty.” Palko v. Connecticut, 302 U. S. 319, 325 (1937).[14] If the practice in question lacks any “oppressive and arbitrary” character, if judicial enforcement of the asserted right would not materially contribute to “a fair and enlightened system of justice,” then the claim is unsuitable for substantive due process protection. Id., at 327, 325. Implicit in Justice Cardozo’s test is a recognition that the postulates of liberty have a universal character. Liberty claims that are inseparable from the customs that prevail in a certain region, the idiosyncratic expectations of a certain group, or the personal preferences of their champions, may be valid claims in some sense; but they are not of constitutional stature. *872 Whether conceptualized as a “rational continuum” of legal precepts, Poe, 367 U. S., at 543 (Harlan, J., dissenting), or a seamless web of moral commitments, the rights embraced by the liberty clause transcend the local and the particular.
Justice Cardozo’s test undeniably requires judges to apply their own reasoned judgment, but that does not mean it involves an exercise in abstract philosophy. In addition to other constraints I will soon discuss, see Part III, infra, historical and empirical data of various kinds ground the analysis. Textual commitments laid down elsewhere in the Constitution, judicial precedents, English common law, legislative and social facts, scientific and professional developments, practices of other civilized societies,[15] and, above all else, the “‘traditions and conscience of our people,’” Palko, 302 U. S., at 325 (quoting Snyder v. Massachusetts, 291 U. S. 97, 105 (1934)), are critical variables. They can provide evidence about which rights really are vital to ordered liberty, as well as a spur to judicial action.
The Court errs both in its interpretation of Palko and in its suggestion that later cases rendered Palko’s methodology defunct. Echoing Duncan, the Court advises that Justice Cardozo’s test will not be satisfied “‘if a civilized system could be imagined that would not accord the particular protection.’” Ante, at 760 (quoting 391 U. S., at 149, n. 14). Palko does contain some language that could be read to set an inordinate bar to substantive due process recognition, reserving it for practices without which “neither liberty nor justice would exist.” 302 U. S., at 326. But in view of Justice Cardozo’s broader analysis, as well as the numerous cases that have upheld liberty claims under the Palko standard, such readings are plainly overreadings. We have never applied Palko in such a draconian manner.
*873 Nor, as the Court intimates, see ante, at 764, did Duncan mark an irreparable break from Palko, swapping out liberty for history. Duncan limited its discussion to “particular procedural safeguard^]” in the Bill of Rights relating to “criminal processes,” 391 U. S., at 149, n. 14; it did not purport to set a standard for other types of liberty interests. Even with regard to procedural safeguards, Duncan did not jettison the Palko test so much as refine it: The judge is still tasked with evaluating whether a practice “is fundamental . . . [to] ordered liberty,” within the context of the “Anglo-American” system. Duncan, 391 U. S., at 149-150, n. 14. Several of our most important recent decisions confirm the proposition that substantive due process analysis — from which, once again, “incorporation” analysis derives — must not be wholly backward looking. See, e. g., Lawrence v. Texas, 539 U. S. 558, 572 (2003) (“[H]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry” (internal quotation marks omitted)); Michael H. v. Gerald D, 491 U. S. 110, 127-128, n. 6 (1989) (opinion of Scalia, J.) (garnering only two votes for history-driven methodology that “consult[s] the most specific tradition available”); see also post, at 917-918 (Breyer, J., dissenting) (explaining that post -Duncan “incorporation” eases continued to rely on more than history).[16]
The Court’s flight from Palko leaves its analysis, careful and scholarly though it is, much too narrow to provide a satisfying answer to this case. The Court hinges its entire decision on one mode of intellectual history, culling selected pronouncements and enactments from the 18th and 19th centuries to ascertain what Americans thought about firearms. *874 Relying on Duncan and Glucksberg, the principal opinion suggests that only interests that have proved “fundamental from an American perspective,” ante, at 784-791 (plurality opinion), or “ ‘deeply rooted in this Nation’s history and tradition,’” ante, at 767 (majority opinion) (quoting Glucksberg, 521 U. S., at 721), to the Court’s satisfaction, may qualify for incorporation into the Fourteenth Amendment. To the extent the principal opinion could be read to imply that the historical pedigree of a right is the exclusive or dispositive determinant of its status under the Due Process Clause, the opinion is seriously mistaken.
A rigid historical test is inappropriate in this case, most basically, because our substantive due process doctrine has never evaluated substantive rights in purely, or even predominantly, historical terms. When the Court applied many of the procedural guarantees in the Bill of Rights to the States in the 1960’s, it often asked whether the guarantee in question was “fundamental in the context of the criminal processes maintained by the American States.”[17] Duncan, 391 U. S., at 150, n. 14. That inquiry could extend back through time, but it was focused not so much on historical conceptions of the guarantee as on its functional significance within the States’ regimes. This contextualized approach made sense, as the choice to employ any given trial-type procedure means little in the abstract. It is only by inquiring into how that procedure intermeshes with other procedures and practices in a criminal justice system that its relationship to “liberty” and “due process” can be determined.
Yet when the Court has used the Due Process Clause to recognize rights distinct from the trial context — rights relating to the primary conduct of free individuals — Justice Cardozo’s test has been our guide. The right to free speech, for *875 instance, has been safeguarded from state infringement not because the States have always honored it, but because it is “essential to free government” and “to the maintenance of democratic institutions” — that is, because the right to free speech is implicit in the concept of ordered liberty. Thornhill v. Alabama, 310 U. S. 88, 95, 96 (1940); see also, e. g., Loving, 388 U. S., at 12 (discussing right to marry person of another race); Mapp v. Ohio, 367 U. S. 643, 650, 655-657 (1961) (discussing right to be free from arbitrary intrusion by police); Schneider v. State (Town of Irvington), 308 U. S. 147, 161 (1939) (discussing right to distribute printed matter).[18] While the verbal formula has varied, the Court has largely been consistent in its liberty-based approach to substantive interests outside of the adjudicatory system. As the question before us indisputably concerns such an interest, the answer cannot be found in a granular inspection of state constitutions or congressional debates.
More fundamentally, a rigid historical methodology is unfaithful to the Constitution’s command. For if it were really the case that the Fourteenth Amendment’s guarantee of liberty embraces only those rights “so rooted in our history, tradition, and practice as to require special protection,” Glucksberg, 521 U. S., at 721, n. 17, then the guarantee would serve little function, save to ratify those rights that state actors have already been according the most extensive protection.[19] Cf. Duncan, 391 U. S., at 183 (Harlan, J., dissenting) (critiquing “circularity]” of historicized test for in *876 corporation). That approach is unfaithful to the expansive principle Americans laid down when they ratified the Fourteenth Amendment and to the level of generality they chose when they crafted its language; it promises an objectivity it cannot deliver and masks the value judgments that pervade any analysis of what, customs, defined in what manner, are sufficiently “ ‘rooted’ ”; it countenances the most revolting injustices in the name of continuity,[20] for we must never forget that not only slavery but also the subjugation of women and other rank forms of discrimination are part of our history; and it effaces this Court’s distinctive role in saying what the law is, leaving the development and safekeeping of liberty to majoritarian political processes. It is judicial abdication in the guise of judicial modesty.
No, the liberty safeguarded by the Fourteenth Amendment is not merely preservative in nature but rather is a “dynamic concept.” Stevens, The Bill of Rights: A Century of Progress, 59 U. Chi. L. Rev. 13, 38 (1992). Its dynamism provides a central means through which the Framers enabled the Constitution to “endure for ages to come,” McCulloch v. Maryland, 4 Wheat. 316, 415 (1819), a central example of how they “wisely spoke in general language and left to succeeding generations the task of applying that language to the unceasingly changing environment in which they would live,” Rehnquist, The Notion of a Living Constitution, 54 Texas L. Rev. 693, 694 (1976). “The task of giving concrete meaning to the term ‘liberty,’” I have elsewhere explained at some length, “was apart of the work assigned to future generations.” Stevens, The Third Branch of Liberty, 41 U. *877 Miami L. Rev. 277, 291 (1986).[21] The judge who would outsource the interpretation of “liberty” to historical sentiment has turned his back on a task the Constitution assigned to him and drained the document of its intended vitality.[22]
Ill
At this point a difficult question arises. In considering such a majestic term as “liberty” and applying it to present circumstances, how are we to do justice to its urgent call and its open texture — and to the grant of interpretive discretion the latter embodies — without injecting excessive subjectivity or unduly restricting the States’ “broad latitude in experimenting with possible solutions to problems of vital local concern,” Whalen v. Roe, 429 U. S. 589, 597 (1977)? One part of the answer, already discussed, is that we must ground the analysis in historical experience and reasoned *878 judgment, and never on “merely personal and private notions.” Rochin v. California, 342 U. S. 165, 170 (1952). Our precedents place a number of additional constraints on the decisional process. Although “guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended,” Collins v. Harker Heights, 503 U. S. 115, 125 (1992), significant guideposts do exist.[23]
The most basic is that we have eschewed attempts to provide any all-purpose, top-down, totalizing theory of “liberty.”[24] That project is bound to end in failure or worse. The Framers did not express a clear understanding of the term to guide us, and the now-repudiated Lochner line of cases attests to the dangers of judicial overconfidence in using substantive due process to advance a broad theory of the right or the good. See, e. g., Lochner v. New York, 198 U. S. 45 (1905). In its most durable precedents, the Court *879 “has not attempted to define with exactness the liberty . . . guaranteed” by the Fourteenth Amendment. Meyer, 262 U. S., at 399; see also, e. g., Bolling, 347 U. S., at 499. By its very nature, the meaning of liberty cannot be “reduced to any formula; its content cannot be determined by reference to any code.” Poe, 367 U. S., at 542 (Harlan, J., dissenting).
Yet while “the 'liberty’ specially protected by the Fourteenth Amendment” is “perhaps not capable of being fully clarified,” Glucksberg, 521 U. S., at 722, it is capable of being refined and delimited. We have insisted that only certain types of especially significant personal interests may qualify for especially heightened protection. Ever since “the deviant economic due process cases [were] repudiated,” id., at 761 (Souter, J., concurring in judgment), our doctrine has steered away from “laws that touch economic problems, business affairs, or social conditions,” Griswold, 381 U. S., at 482, and has instead centered on “matters relating to marriage, procreation, contraception, family relationships, and child rearing and education,” Paul v. Davis, 424 U. S. 693, 713 (1976). These categories are not exclusive. Government action that shocks the conscience, pointlessly infringes settled expectations, trespasses into sensitive private realms or life choices without adequate justification, perpetrates gross injustice, or simply lacks a rational basis will always be vulnerable to judicial invalidation. Nor does the fact that an asserted right falls within one of these categories end the inquiry. More fundamental rights may receive more robust judicial protection, but the strength of the individual’s liberty interests and the State’s regulatory interests must always be assessed and compared. No right is absolute.
Rather than seek a categorical understanding of the liberty clause, our precedents have thus elucidated a conceptual core. The clause safeguards, most basically, “the ability independently to define one’s identity,” Roberts v. United States Jaycees, 468 U. S. 609, 619 (1984), “the individual’s right to make certain unusually important decisions that will *880 affect his own, or his family's, destiny,” Fitzgerald, 523 F. 2d, at 719, and the right to be respected as a human being. Self-determination, bodily integrity, freedom of conscience, intimate relationships, political equality, dignity and respect — these are the central values we have found implicit in the concept of ordered liberty.
Another key constraint on substantive due process analysis is respect for the democratic process. If a particular liberty interest is already being given careful consideration in, and subjected to ongoing calibration by, the States, judicial enforcement may not be appropriate. When the Court declined to establish a general right to physician-assisted suicide, for example, it did so in part because “the States [were] currently engaged in serious, thoughtful examinations of physician-assisted suicide and other similar issues,” rendering judicial intervention both less necessary and potentially more disruptive. Glucksberg, 521 U. S., at 719, 735. Conversely, we have long appreciated that more “searching” judicial review may be justified when the rights of “discrete and insular minorities” — groups that may face systematic barriers in the political system — are at stake. United States v. Carolene Products Co., 304 U. S. 144, 153, n. 4 (1938). Courts have a “comparative . .. advantage” over the elected branches on a limited, but significant, range of legal matters. Post, at 919.
Recognizing a new liberty right is a momentous step. It takes that right, to a considerable extent, “outside the arena of public debate and legislative action.” Glucksberg, 521 U. S., at 720. Sometimes that momentous step must be taken; some fundamental aspects of personhood, dignity, and the like do not vary from State to State, and demand a baseline level of protection. But sensitivity to the interaction between the intrinsic aspects of liberty and the practical realities of contemporary society provides an important tool for guiding judicial discretion.
*881 This sensitivity is an aspect of a deeper principle: the need to approach our work with humility and caution. Because the relevant constitutional language is so “spacious,” Duncan, 391 U. S., at 148,1 have emphasized that “[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we' are asked to break new ground in this field.” Collins, 503 U. S., at 125. Many of my colleagues and predecessors have stressed the same point, some with great eloquence. See, e. g., Casey, 505 U. S., at 849; Moore v. East Cleveland, 431 U. S. 494, 502-503 (1977) (plurality opinion); Poe, 367 U. S., at 542-545 (Harlan, J., dissenting); Adamson v. California, 332 U. S. 46, 68 (1947) (Frankfurter, J., concurring). Historical study may discipline as well as enrich the analysis. But the inescapable reality is that no serious theory of §1 of the Fourteenth Amendment yields clear answers in every case, and “[n]o formula could serve as a substitute, in this area, for judgment and restraint.” Poe, 367 U. S., at 542 (Harlan, J., dissenting).
Several rules of the judicial process help enforce such restraint. In the substantive due process field as in others, the Court has applied both the doctrine of stare decisis— adhering to precedents, respecting reliance interests, prizing stability and order in the law — and the common-law method — taking cases and controversies as they present themselves, proceeding slowly and incrementally, building on what came before. This restrained methodology was evident even in the heyday of “incorporation” during the 1960’s. Although it would have been much easier for the Court simply to declare certain Amendments in the Bill of Rights applicable to the States in toto, the Court took care to parse each Amendment into its component guarantees, evaluating them one by one. This piecemeal approach allowed the Court to scrutinize more closely the right at issue in any given dispute, reducing both the risk and the cost of error.
*882 Relatedly, rather than evaluate liberty claims on an abstract plane, the Court has “required in substantive-due-process cases a ‘careful description’ of the asserted fundamental liberty interest.” Glucksberg, 521 U. S., at 721 (quoting Reno v. Flores, 507 U. S. 292, 302 (1993); Collins, 503 U. S., at 125; Cruzan v. Director, Mo. Dept. of Health, 497 U. S. 261, 277-278 (1990)). And just as we have required such careful description from the litigants, we have required of ourselves that we “focus on the allegations in the complaint to determine how petitioner describes the constitutional right at stake.” Collins, 503 U. S., at 125; see also Stevens, Judicial Restraint, 22 San Diego L. Rev. 437, 446-448 (1985). This does not mean that we must define the asserted right at the most specific level, thereby sapping it of a universal valence and a moral force it might otherwise have.[25] It means, simply, that we must pay close attention to the precise liberty interest the litigants have asked us to vindicate.
Our holdings should be similarly tailored. Even if the most expansive formulation of a claim does not qualify for substantive due process recognition, particular components of the claim might. Just because there may not be a cate *883 gorical right to physician-assisted suicide, for example, does not “'foreclose the possibility that an individual plaintiff seeking to hasten her death, or a doctor whose assistance was sought, could prevail in a more particularized challenge.’” Glucksberg, 521 U. S., at 735, n. 24 (quoting id., at 750 (Stevens, J., concurring in judgments)); see also Vacco v. Quill, 521 U. S. 793, 809, n. 13 (1997) (leaving open “ 'the possibility that some applications of the New York [prohibition on assisted suicide] may impose an intolerable intrusion on the patient’s freedom’”). Even if a State’s interest in regulating a certain matter must be permitted, in the general course, to trump the individual’s countervailing liberty interest, there may still be situations in which the latter “is entitled to constitutional protection.” Glucksberg, 521 U. S., at 742 (Stevens, J., concurring in judgments).
As this discussion reflects, to acknowledge that the task of construing the liberty clause requires judgment is not to say that it is a license for unbridled judicial lawmaking. To the contrary, only an honest reckoning with our discretion allows for honest argumentation and meaningful accountability.
IV
The question in this case, then, is not whether the Second Amendment right to keep and bear arms (whatever that right’s precise contours) applies to the States because the Amendment has been incorporated into the Fourteenth Amendment. It has not been. The question, rather, is whether the particular right asserted by petitioners applies to the States because of the Fourteenth Amendment itself, standing on its own bottom. And to answer that question, we need to determine, first, the nature of the right that has been asserted and, second, whether that right is an aspect of Fourteenth Amendment “liberty.” Even accepting the Court’s holding in Heller, it remains entirely possible that the right to keep and bear arms identified in that opin *884 ion is not judicially enforceable against the States, or that only part of the right is so enforceable.[26] It is likewise possible for the Court to find in this case that some part of the Heller right applies to the States, and then to find in later cases that other parts of the right also apply, or apply on different terms.
As noted at the outset, the liberty interest petitioners have asserted is the “right to possess a functional, personal firearm, including a handgun, within the home.” Complaint ¶ 84, App. 23. The city of Chicago allows residents to keep functional firearms, so long as they are registered, but it generally prohibits the possession of handguns, sawed-off shotguns, machineguns, and short-barreled rifles. See Chicago, Ill., Municipal Code §8-20-050 (2009).[27] Petitioners’ complaint centered on their desire to keep a handgun at their domicile — it references the “home” in nearly every paragraph, see Complaint ¶¶3-4, 11-30, 32, 34, 37, 42, 44, 46, App. 17, 19-26 — as did their supporting declarations, see, e. g., App. 34, 36, 40, 43, 49-52, 54-56. Petitioners now frame the question that confronts us as “[wjhether the Second Amendment right to keep and bear arms is incorporated as against the States by the Fourteenth Amendment’s Privi *885 leges or Immunities or Due Process Clauses.” Brief for Petitioners i. But it is our duty “to focus on the allegations in the complaint to determine how petitioner describes the constitutional right at stake,” Collins, 503 U. S., at 125, and the gravamen of this complaint is plainly an appeal to keep a handgun or other firearm of one’s choosing in the home.
Petitioners’ framing of their complaint tracks the Court’s ruling in Heller. The majority opinion contained some dicta suggesting the possibility of a more expansive arms-bearing right, one that would travel with the individual to an extent into public places, as “in case of confrontation.” 554 U. S., at 592. But the Heller plaintiff sought only dispensation to keep an operable firearm in his home for lawful self-defense, see id., at 576, and n. 2, and the Court’s opinion was book-ended by reminders that its holding was limited to that one issue, id., at 573, 635; accord, ante, at 791 (plurality opinion). The distinction between the liberty right these petitioners have asserted and the Second Amendment right identified in Heller is therefore evanescent. Both are rooted to the home. Moreover, even if both rights have the logical potential to extend further, upon “future evaluation,” Heller, 554 U. S., at 635, it is incumbent upon us, as federal judges contemplating a novel rule that would bind all 50 States, to proceed cautiously and to decide only what must be decided.
Understood as a plea to keep their preferred type of firearm in the home, petitioners’ argument has real force.[28] The decision to keep a loaded handgun in the house is often motivated by the desire to protect life, liberty, and property. It is comparable, in some ways, to decisions about the education and upbringing of one’s children. For it is the kind of *886 decision that may have profound consequences for every member of the family, and for the world beyond. In considering whether to keep a handgun, heads of households must ask themselves whether the desired safety benefits outweigh the risks of deliberate or accidental misuse that may result in death or serious injury, not only to residents of the home but to others as well. Millions of Americans have answered this question in the affirmative, not infrequently because they believe they have an inalienable right to do so — because they consider it an aspect of “the supreme human dignity of being master of one’s fate rather than a ward of the State,” Indiana v. Edwards, 554 U. S. 164, 186 (2008) (Scalia, J., dissenting). Many such decisions have been based, in part, on family traditions and deeply held beliefs that are an aspect of individual autonomy the government may not control.[29]
Bolstering petitioners’ claim, our law has long recognized that the home provides a kind of special sanctuary in modern life. See, e. g., U. S. Const., Arndts. 3,4; Lawrence, 539 U. S., at 562, 567; Payton v. New York, 445 U. S. 573, 585-590 (1980); Stanley v. Georgia, 394 U. S. 557, 565-568 (1969); Griswold, 381 U. S., at 484-485. Consequently, we have long accorded special deference to the privacy of the home, whether a humble cottage or a magnificent manse. This veneration of the domestic harkens back to the common law. William Blackstone recognized a “right of habitation,” 4 Commentaries *223, and opined that “every man’s house is looked upon by the law to be his castle of defence and asylum,” 3 id., at *288. Heller carried forward this legacy, observing that “the need for defense of self, family, and property is most acute” in one’s abode, and celebrating “the right of law-abiding, responsible citizens to use arms in defense of hearth and home.” 554 U. S., at 628, 635.
While the individual’s interest in firearm possession is thus heightened in the home, the State’s corresponding interest *887 in regulation is somewhat weaker. The State generally has a lesser basis for regulating private as compared to public acts, and firearms kept inside the home generally pose a lesser threat to public welfare as compared to firearms taken outside. The historical case for regulation is likewise stronger outside the home, as many States have for many years imposed stricter, and less controversial, restrictions on the carriage of arms than on their domestic possession. See, e. g., id., at 626 (noting that “the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues”); English v. State, 35 Tex. 473, 478-479 (1871) (observing that “almost, if not every one of the States of this Union have [a prohibition on the carrying of deadly weapons] upon their statute books,” and lambasting claims of a right to carry such weapons as “little short of ridiculous”); Miller, Guns as Smut: Defending the Home-Bound Second Amendment, 109 Colum. L. Rev. 1278, 1321-1336 (2009).
It is significant, as well, that a rule limiting the federal constitutional right to keep and bear arms to the home would be less intrusive on state prerogatives and easier to administer. Having unleashed in Heller a tsunami of legal uncertainty, and thus litigation,[30] and now on the cusp of imposing a national rule on the States in this area for the first time in United States history, the Court could at least moderate the confusion, upheaval, and burden on the States by adopting a rule that is clearly and tightly bounded in scope.
In their briefs to this Court, several amici have sought to bolster petitioners’ claim still further by invoking a right to *888 individual self-defense.[31] As petitioners note, the Heller majority discussed this subject extensively and remarked that “the inherent right of self-defense has been central to the Second Amendment right.” 554 U. S., at 628. And it is true that if a State were to try to deprive its residents of any reasonable means of defending themselves from imminent physical threats, or to deny persons any ability to assert self-defense in response to criminal prosecution, that might pose a significant constitutional problem. The argument that there is a substantive due process right to be spared such untenable dilemmas is a serious one.[32]
*889 But that is not the ease before us. Petitioners have not asked that we establish a constitutional right to individual self-defense; neither their pleadings in the District Court nor their filings in this Court make any such request. Nor do petitioners contend that the city of Chicago — which, recall, allows its residents to keep most rifles and shotguns, and to keep them loaded — has unduly burdened any such right. What petitioners have asked is that we “incorporate” the Second Amendment and thereby establish a constitutional entitlement, enforceable against the States, to keep a handgun in the home.
Of course, owning a handgun may be useful for practicing self-defense. But the right to take a certain type of action is analytically distinct from the right to acquire and utilize specific instrumentalities in furtherance of that action. And while some might favor handguns, it is not clear that they are a superior weapon for lawful self-defense, and nothing in petitioners’ argument turns on that being the case. The notion that a right of self-defense implies an auxiliary right to own a certain type of firearm presupposes not only controversial judgments about the strength and scope of the (posited) self-defense right, but also controversial assumptions *890 about the likely effects of making that type of firearm more broadly available. It is a very long way from the proposition that the Fourteenth Amendment protects a basic individual right of self-defense to the conclusion that a city may not ban handguns.[33]
In short, while the utility of firearms, and handguns in particular, to the defense of hearth and home is certainly relevant to an assessment of petitioners’ asserted right, there is no freestanding self-defense claim in this case. The question we must decide is whether the interest in keeping in the home a firearm of one’s choosing — a handgun, for petitioners — is one that is “comprised within the term liberty” in the Fourteenth Amendment. Whitney, 274 U. S., at 373 (Brandeis, J., concurring).
V
While I agree with the Court that our substantive due process cases offer a principled basis for holding that petitioners have a constitutional right to possess a usable firearm in the home, I am ultimately persuaded that a better reading of our case law supports the city of Chicago. I would not foreclose the possibility that a particular plaintiff — say, an elderly widow who lives in a dangerous neighborhood and does not have the strength to operate a long gun — may have *891 a cognizable liberty interest in possessing a handgun. But I cannot accept petitioners’ broader submission. A number of factors, taken together, lead me to this conclusion.
First, firearms have a fundamentally ambivalent relationship to liberty. Just as they can help homeowners defend their families and property from intruders, they can help thugs and insurrectionists murder innocent victims. The threat that firearms will be misused is far from hypothetical, for gun crime has devastated many of our communities. Amici calculate that approximately 1 million Americans have been wounded or killed by gunfire in the last decade.[34] Urban areas such as Chicago suffer disproportionately from this epidemic of violence. Handguns contribute disproportionately to it. Just as some homeowners may prefer handguns because of their small size, light weight, and ease of operation, some criminals will value them for the same reasons. See Heller, 554 U. S., at 710-712 (Breyer, J., dissenting). In recent years, handguns were reportedly used in more than four-fifths of firearm murders and more than half of all murders nationwide.[35]
Hence, in evaluating an asserted right to be free from par-' ticular gun-control regulations, liberty is on both sides of the equation. Guns may be useful for self-defense, as well as for hunting and sport, but they also have a unique potential to facilitate death and destruction and thereby to destabilize ordered liberty. Your interest in keeping and bearing a certain firearm may diminish my interest in being and feeling safe from armed violence. And while granting you the right *892 to own a handgun might make you safer on any given day — assuming the handgun’s marginal contribution to self-defense outweighs its marginal contribution to the risk of accident, suicide, and criminal mischief — it may make you and the community you live in less safe overall, owing to the increased number of handguns in circulation. It is at least reasonable for a democratically elected legislature to take such concerns into account in considering what sorts of regulations would best serve the public welfare.
The practical impact of various gun-control measures may be highly controversial, but this basic insight should not be. The idea that deadly weapons pose a distinctive threat to the social order — and that reasonable restrictions on their usage therefore impose an acceptable burden on one’s personal liberty — is as old as the Republic. As The Chief Justice observed just the other day, it is a foundational premise of modern government that the State holds a monopoly on legitimate violence: “A basic step in organizing a civilized society is to take [the] sword out of private hands and turn it over to an organized government, acting on behalf of all the people.” Robertson v. United States ex rel. Watson, 560 U. S. 272, 282-283 (2010) (dissenting opinion). The same holds true for the handgun. The power a man has in the state of nature “of doing whatsoever he thought fit for the preservation of himself and the rest of mankind, he gives up,” to a significant extent, “to be regulated by laws made by the society.” J. Locke, Second Treatise of Civil Government § 129, p. 64 (J. Gough ed. 1947).
Limiting the federal constitutional right to keep and bear arms to the home complicates the analysis but does not dislodge this conclusion. Even though the Court has long afforded special solicitude for the privacy of the home, we have never understood that principle to “infring[e] upon” the authority of the States to proscribe certain inherently dangerous items, for “[i]n such cases, compelling reasons may exist for overriding the right of the individual to possess those *893 materials.” Stanley, 394 U. S., at 568, n. 11. And, of course, guns that start out in the home may not stay in the home. Even if the government has a weaker basis for restricting domestic possession of firearms as compared to public carriage — and even if a blanket, statewide prohibition on domestic possession might therefore be unconstitutional— the line between the two is a porous one. A state or local legislature may determine that a prophylactic ban on an especially portable weapon is necessary to police that line.
Second, the right to possess a firearm of one’s choosing is different in kind from the liberty interests we have recognized under the Due Process Clause. Despite the plethora of substantive due process cases that have been decided in the post-Lochner century, I have found none that holds, states, or even suggests that the term “liberty” encompasses either the common-law right of self-defense or a right to keep and bear arms. I do not doubt for a moment that many Americans feel deeply passionate about firearms, and see them as critical to their way of life as well as to their security. Nevertheless, it does not appear to be the case that the ability to own a handgun, or any particular type of firearm, is critical to leading a life of autonomy, dignity, or political equality: The marketplace offers many tools for self-defense, even if they are imperfect substitutes, and neither petitioners nor their amici make such a contention. Petitioners’ claim is not the kind of substantive interest, accordingly, on which a uniform, judicially enforced national standard is presumptively appropriate.[36]
*894 Indeed, in some respects the substantive right at issue may be better viewed as a property right. Petitioners wish to acquire certain types of firearms, or to keep certain firearms they have previously acquired. Interests in the possession of chattels have traditionally been viewed as property interests subject to definition and regulation by the States. Cf. Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Protection, 560 U. S. 702, 707 (2010) (opinion for the Court by Scalia, J.) (“Generally speaking, state law defines property interests”). Under that tradition, Chicago’s ordinance is unexceptional.[37]
The liberty interest asserted by petitioners is also dissimilar from those we have recognized in its capacity to undermine the security of others. To be sure, some of the Bill of Rights’ procedural guarantees may place “restrictions on *895 law enforcement” that have “controversial public safety implications.” Ante, at 783 (plurality opinion); see also ante, at 799 (opinion of Scalia, J.). But those implications are generally quite attenuated. A defendant’s invocation of his right to remain silent, to confront a witness, or to exclude certain evidence cannot directly cause any threat. The defendant’s liberty interest is constrained by (and is itself a constraint on) the adjudicatory process. The link between handgun ownership and public safety is much tighter. The handgun is itself a tool for crime; the handgun’s bullets are the violence.
Similarly, it is undeniable that some may take profound offense at a remark made by the soapbox speaker, the practices of another religion, or a gay couple’s choice to have intimate relations. But that offense is moral, psychological, or theological in nature; the actions taken by the rights bearers do not actually threaten the physical safety of any other person.[38] Firearms may be used to kill another person. If a legislature’s response to dangerous weapons ends up impinging upon the liberty of any individuals in pursuit of the greater good, it invariably does so on the basis of more than the majority’s “ ‘own moral code,’ ” Lawrence, 539 U. S., at 571 (quoting Casey, 505 U. S., at 850). While specific policies may of course be misguided, gun control is an area in which it “is quite wrong ... to assume that regulation and liberty occupy mutually exclusive zones — that as one expands, the other must contract.” Stevens, 41 U. Miami L. Rev., at 280.
Third, the experience of other advanced democracies, including those that share our British heritage, undercuts the notion that an expansive right to keep and bear arms is intrinsic to ordered liberty. Many of these countries place restrictions on the possession, use, and carriage of firearms far more onerous than the restrictions found in this Nation. *896 See Municipal Respondents’ Brief 21-23 (discussing laws of England, Canada, Australia, Japan, Denmark, Finland, Luxembourg, and New Zealand), That the United States is an international outlier in the permissiveness of its approach to guns does not suggest that our laws are bad laws. It does suggest that this Court may not need to assume responsibility for making our laws still more permissive.
Admittedly, these other countries differ from ours in many relevant respects, including their problems with violent crime and the traditional role that firearms have played in their societies. But they are not so different from the United States that we ought to dismiss their experience entirely. Cf. ante, at 781-782 (plurality opinion); ante, at 800-801 (opinion of Scalia, J.). The fact that our oldest allies have almost uniformly found it appropriate to regulate firearms extensively tends to weaken petitioners’ submission that the right to possess a gun of one’s choosing is fundamental to a life of liberty. While the “American perspective” must always be our focus, ante, at 784, 791 (plurality opinion), it is silly — indeed, arrogant — to think we have nothing to learn about liberty from the billions of people beyond our borders.
Fourth, the Second Amendment differs in kind from the Amendments that surround it, with the consequence that its inclusion in the Bill of Rights is not merely unhelpful but positively harmful to petitioners’ claim. Generally, the inclusion of a liberty interest in the Bill of Rights points toward the conclusion that it is of fundamental significance and ought to be enforceable against the States. But the Second Amendment plays a peculiar role within the Bill, as announced by its peculiar opening clause.[39] Even accepting the Heller Court’s view that the Amendment protects an individual right to keep and bear arms disconnected from militia service, it remains undeniable that “the purpose for which *897 the right was codified” was “to prevent elimination of the militia.” Heller, 554 U. S., at 599; see also United States v. Miller, 307 U. S. 174, 178 (1939) (Second Amendment was enacted “[w]ith obvious purpose to assure the continuation and render possible the effectiveness of [militia] forces”). It was the States, not private persons, on whose immediate behalf the Second Amendment was adopted. Notwithstanding the Heller Court’s efforts to write the Second Amendment’s preamble out of the Constitution, the Amendment still serves the structural function of protecting the States from encroachment by an overreaching Federal Government.
The Second Amendment, in other words, “is a federalism provision,” Elk Grove Unified School Dist. v. Newdow, 542 U. S. 1, 45 (2004) (Thomas, J., concurring in judgment). It is directed at preserving the autonomy of the sovereign States, and its logic therefore “resists” incorporation by a federal court against the States. Ibid. No one suggests that the Tenth Amendment, which provides that powers not given to the Federal Government remain with “the States,” applies to the States; such a reading would border on incoherent, given that the Tenth Amendment exists (in significant part) to safeguard the vitality of state governance. The Second Amendment is no different.[40]
The Court is surely correct that Americans’ conceptions of the Second Amendment right evolved over time in a more individualistic direction; that Members of the Reconstruction Congress were urgently concerned about the safety of the newly freed slaves; and that some Members believed that, *898 following ratification of the Fourteenth Amendment, the Second Amendment would apply to the States. But it is a giant leap from these data points to the conclusion that the Fourteenth Amendment “incorporated” the Second Amendment as a matter of original meaning or postenactment interpretation. Consider, for example, that the text of the Fourteenth Amendment says nothing about the Second Amendment or firearms; that there is substantial evidence to suggest that, when the Reconstruction Congress enacted measures to ensure newly freed slaves and Union sympathizers in the South enjoyed the right to possess firearms, it was motivated by antidiscrimination and equality concerns rather than arms-bearing concerns per se;[41] that many contemporaneous courts and commentators did not understand the Fourteenth Amendment to have had an “incorporating” effect; and that the States heavily regulated the right to keep and bear arms both before and after the Amendment’s passage. The Court’s narrative largely elides these facts. The complications they raise show why even the most dogged historical inquiry into the “fundamentality” of the Second Amendment right (or any other) necessarily entails judicial judgment— and therefore judicial discretion — every step of the way.
I accept that the evolution in Americans’ understanding of the Second Amendment may help shed light on the question whether a right to keep and bear arms is included *899 within Fourteenth Amendment “liberty.” But the reasons that motivated the Framers to protect the ability of militiamen to keep muskets available for military use when our Nation was in its infancy, or that motivated the Reconstruction Congress to extend full citizenship to the freedmen in the wake of the Civil War, have only a limited bearing on the question that confronts the homeowner in a crime-infested metropolis today. The many episodes of brutal violence against African-Americans that blight our Nation’s history, see ante, at 771-776 (majority opinion); ante, at 843-847, 856-858 (Thomas, J., concurring in part and concurring in judgment), do not suggest that every American must be allowed to own whatever type of firearm he or she desires— just that no group of Americans should be systematically and discriminatorily disarmed and left to the mercy of racial terrorists. And the fact that some Americans may have thought or hoped that the Fourteenth Amendment would nationalize the Second Amendment hardly suffices to justify the conclusion that it did.
Fifth, although it may be true that Americans’ interest in firearm possession and state-law recognition of that interest are “deeply rooted” in some important senses, ante, at 767 (internal quotation marks omitted), it is equally true that the States have a long and unbroken history of regulating firearms. The idea that States may place substantial restrictions on the right to keep and bear arms short of complete disarmament is, in fact, far more entrenched than the notion that the Federal Constitution protects any such right] Federalism is a far “older and more deeply rooted tradition than is a right to carry,” or to own, “any particular kind of weapon.” 567 F. 3d, at 860 (Easterbrook, C. J.).
From the early days of the Republic, through the Reconstruction era, to the present day, States and municipalities have placed extensive licensing requirements on firearm acquisition, restricted the public carriage of weapons, and banned altogether the possession of especially dangerous *900 weapons, including handguns. See Heller, 554 U. S., at 683-687 (Breyer, J., dissenting) (reviewing colonial laws); Cornell & DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Ford. L. Rev. 487, 502-516 (2004) (reviewing pre-Civil War laws); Brief for Thirty-four Professional Historians and Legal Historians as Amici Curiae 4-22 (reviewing Reconstruction-era laws); Winkler, Scrutinizing the Second Amendment, 105 Mich. L. Rev 683, 711-712, 716-726 (2007) (reviewing 20th-century laws); see generally post, at 931-941.[42] After the 1860’s just as before, the state courts almost uniformly upheld these measures: Apart from making clear that all regulations had to be constructed and applied in a nondiscriminatory manner, the Fourteenth Amendment hardly made a dent. And let us not forget that this Court did not recognize any non-militia-related interests under the Second Amendment until two Terms ago, in Heller, Petitioners do not dispute the city of Chicago’s observation that “[n]o other substantive Bill of Rights protection has been regulated nearly as intrusively” as the right to keep and bear arms. Municipal Respondents’ Brief 25.[43]
This history of intrusive regulation is not surprising given that the very text of the Second Amendment calls out for *901 regulation,[44] and the ability to respond to the social ills associated with dangerous weapons goes to the very core of the States’ police powers. Our precedent is crystal clear on this latter point. See, e. g., Gonzales v. Oregon, 546 U. S. 243, 270 (2006) (“[T]he structure and limitations of federalism ... allow the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons” (internal quotation marks omitted)); United States v. Morrison, 529 U. S. 598, 618 (2000) (“[W]e can think of no better example of the police power, which the Pounders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims”); Kelley v. Johnson, 425 U. S. 238, 247 (1976) (“The promotion of safety of persons and property is unquestionably at the core of the State’s police power”); Automobile Workers v. Wisconsin Employment Relations Bd., 351 U. S. 266, 274 (1956) (“The dominant interest of the State in preventing violence and property damage cannot be questioned. It is a matter of genuine local concern”). Compared with today’s ruling, most if not all of *902 this Court’s decisions requiring the States to comply with other provisions in the Bill of Rights did not exact nearly so heavy a toll in terms of state sovereignty.
Finally, even apart from the States’ long history of firearms regulation and its location at the core of their police powers, this is a quintessential area in which federalism ought to be allowed to flourish without this Court’s meddling. Whether or not we can assert a plausible constitutional basis for intervening, there are powerful reasons why we should not do so.
Across the Nation, States and localities vary significantly in the patterns and problems of gun violence they face, as well as in the traditions and cultures of lawful gun use they claim. Cf. post, at 927. The city of Chicago, for example, faces a pressing challenge in combating criminal street gangs. Most rural areas do not. The city of Chicago has a high population density, which increases the potential for a gunman to inflict mass terror and casualties. Most rural areas do not.[45] The city of Chicago offers little in the way of hunting opportunities. Residents of rural communities are, one presumes, much more likely to stock the dinner table with game they have personally felled.
Given that relevant background conditions diverge so much across jurisdictions, the Court ought to pay particular heed to state and local legislatures’ “right to experiment.” New State Ice, 285 U. S., at 311 (Brandeis, J., dissenting). So long as the regulatory measures they have chosen are not “arbitrary, capricious or unreasonable,” we should be allowing them to “try novel social and economic” policies. Ibid. It “is more in keeping . . . with our status as a court in a federal system,” under these circumstances, “to avoid impos *903 mg a single solution ... from the top down.” Smith v. Robbins, 528 U. S. 259, 275 (2000).
It is all the more unwise for this Court to limit experimentation in an area “where the best solution is far from clear.” United States v. Lopez, 514 U. S. 549, 581 (1995) (Kennedy, J., concurring). Pew issues of public policy are subject to such intensive and rapidly developing empirical controversy as gun control. See Heller, 554 U. S., at 699-704 (Breyer, J., dissenting). Chicago’s handgun ban, in itself, has divided researchers. Compare Brief for Professors of Criminal Justice as Amici Curiae (arguing that ordinance has been effective at reducing gun violence) with Brief for International Law Enforcement Educators and Trainers Association et al. as Amici Curiae 17-26 (arguing that ordinance has been a failure).[46] Of course, on some matters the Constitution requires that we ignore such pragmatic considerations. But the Constitution’s text, history, and structure are not so clear on the matter before us — as evidenced by the groundbreaking nature of today’s fractured decision — and this Court lacks both the technical capacity and the localized expertise to assess “the wisdom, need, and propriety” of most gun-control measures. Griswold, 381 U. S., at 482.[47]
*904 Nor will the Court’s intervention bring any clarity to this enormously complex area of law. Quite to the contrary, today’s decision invites an avalanche of litigation that could mire the federal courts in fine-grained determinations about which state and local regulations comport with the Heller right — the precise contours of which are far from pellucid— under a standard of review we have not even established. See post, at 923-926. The plurality’s “assuranc[e]” that “incorporation does not imperil every law regulating firearms,” ante, at 786, provides only modest comfort. For it is also an admission of just how many different types of regulations are potentially implicated by today’s ruling, and of just how ad hoc the Court's initial attempt to draw distinctions among them was in Heller. The practical significance of the proposition that “the Second Amendment right is fully applicable to the States,” ante, at 750 (majority opinion), remains to be worked out by this Court over many, many years.
Furthermore, and critically, the Court’s imposition of a national standard is still more unwise because the elected branches have shown themselves to be perfectly capable of safeguarding the interest in keeping and bearing arms. The strength of a liberty claim must be assessed in connection with its status in the democratic process. And in this case, no one disputes “that opponents of [gun] control have considerable political power and do not seem to be at a systematic disadvantage in the democratic process,” or that “the widespread commitment to an individual right to own guns . . . operates as a safeguard against excessive or unjustified gun *905 control laws.”[48] Sunstein, Second Amendment Minimalism: Heller as Griswold, 122 Harv. L. Rev. 246, 260 (2008). Indeed, there is a good deal of evidence to suggest that, if anything, American lawmakers tend to tmder-regulate guns, relative to the policy views expressed by majorities in opinion polls. See K. Goss, Disarmed: The Missing Movement for Gun Control in America 6 (2006). If a particular State or locality has enacted some “improvident” gun-control measures, as petitioners believe Chicago has done, there is no apparent reason to infer that the mistake will not “eventually be rectified by the democratic process.” Vance v. Bradley, 440 U. S. 93, 97 (1979).
This is not a case, then, that involves a “special condition” that “may call for a correspondingly more searching judicial inquiry.” Carolene Products, 304 U. S., at 153, n. 4. Neither petitioners nor those most zealously committed to their views represent a group or a claim that is liable to receive unfair treatment at the hands of the majority. On the contrary, petitioners’ views are supported by powerful participants in the legislative process. Petitioners have given us no reason to believe that the interest in keeping and bearing-arms entails any special need for judicial lawmaking, or that federal judges are more qualified to craft appropriate rules than the people’s elected representatives. Having failed to show why their asserted interest is intrinsic to the concept of ordered liberty or vulnerable to maltreatment in the political arena, they have failed to show why “the word liberty in the Fourteenth Amendment” should be “held to prevent the natural outcome of a dominant opinion” about how to deal with the problem of handgun violence in the city of Chicago. Lochner, 198 U. S., at 76 (Holmes, J., dissenting).
*906 VI
The preceding sections have already addressed many of the points made by Justice Scalia in his concurrence. But in light of that opinion’s fixation on this one, it is appropriate to say a few words about Justice Scalia’s broader claim: that his preferred method of substantive due process analysis, a method “that makes the traditions of our people paramount,” ante, at 792, is both more restrained and more facilitative of democracy than the method I have outlined. Colorful as it is, Justice Scalia’s critique does not have nearly as much force as does his rhetoric. His theory of substantive due process, moreover, comes with its own profound difficulties.
Although Justice Scalia aspires to an “objective,” “neutral” method of substantive due process analysis, ante, at 800, his actual method is nothing of the sort. Under the “historically focused” approach he advocates, ante, at 808, numerous threshold questions arise before one ever gets to the history. At what level of generality should one frame the liberty interest in question? See n. 25, supra. What does it mean for a right to be “ ‘deeply rooted in this Nation’s history and tradition,’ ” ante, at 793 (quoting Glucksberg, 521 U. S., at 721)? By what standard will that proposition be tested? Which types of sources will count, and how will those sources be weighed and aggregated? There is no objective, neutral answer to these questions. There is not even a theory — at least, Justice Scalia provides none — of how to go about answering them.
Nor is there any escaping Palko, it seems. To qualify for substantive due process protection, Justice Scalia has stated, an asserted liberty right must be not only deeply rooted in American tradition, “but it must also be implicit in the concept of ordered liberty.” Lawrence, 539 U. S., at 593, n. 3 (dissenting opinion) (internal quotation marks omitted). Applying the latter, Poi/co-derived half of that test requires *907 precisely the sort of reasoned judgment — the same multifaceted evaluation of the right’s contours and consequences— that Justice Scalia mocks in his concurrence today.
So does applying the first half. It is hardly a novel insight that history is not an objective science, and that its use can therefore “point in any direction the judges favor,” ante, at 804 (opinion of Scalia, J.). Yet 21 years after the point was brought to his attention by Justice Brennan, Justice Scalia remains “oblivious to the fact that [the concept of ‘tradition’] can be as malleable and as elusive as ‘liberty’ itself.” Michael H., 491 U. S., at 137 (dissenting opinion). Even when historical analysis is focused on a discrete proposition, such as the original public meaning of the Second Amendment, the evidence often points in different directions. The historian must choose which pieces to credit and which to discount, and then must try to assemble them into a coherent whole. In Heller, Justice Scalia preferred to rely on sources created much earlier and later in time than the Second Amendment itself, see, e. g., 554 U. S., at 577-578 (consulting late-19th-century treatises to ascertain how Americans would have read the Amendment’s preamble in 1791); I focused more closely on sources contemporaneous with the Amendment’s drafting and ratification.[49] No mechanical yardstick can measure which of us was correct, either with respect to the materials we chose to privilege or the insights we gleaned from them.
The malleability and elusiveness of history increase exponentially when we move from a pure question of original meaning, as in Heller, to Justice Scalia’s theory of substan *908 tive due process. At least with the former sort of question, the judge can focus on a single legal provision; the temporal scope of the inquiry is (or should be) relatively bounded; and there is substantial agreement on what sorts of authorities merit consideration. With Justice Scalia’s approach to. substantive due process, these guideposts all fall away. The judge must canvas the entire landscape of American law as it has evolved through time, and perhaps older laws as well, see, e. g., Lawrence, 539 U. S., at 596 (Scalia, J., dissenting) (discussing “ ‘ancient roots’ ” of proscriptions against sodomy (quoting Bowers v. Hardwick, 478 U. S. 186, 192 (1986))), pursuant to a standard (deeply rootedness) that has never been defined. In conducting this rudderless, panoramic tour of American legal history, the judge has more than ample opportunity to “look over the heads of the crowd and pick out [his] friends,” Roper v. Simmons, 543 U. S. 551, 617 (2005) (Scalia, J., dissenting).
My point is not to criticize judges’ use of history in general or to suggest that it always generates indeterminate answers; I have already emphasized that historical study can discipline as well as enrich substantive due process analysis. My point is simply that Justice Scalia’s defense of his method, which holds out objectivity and restraint as its cardinal — and, it seems, only — virtues, is unsatisfying on its own terms. For a limitless number of subjective judgments may be smuggled into his historical analysis. Worse, they may be buried in the analysis. At least with my approach, the judge’s cards are laid on the table for all to see, and to critique. The judge must exercise judgment, to be sure. When answering a constitutional question to which the text provides no clear answer, there is always some amount of discretion; our constitutional system has always depended on judges’ filling in the document’s vast open spaces.[50] But there is also transparency.
*909 Justice Scalia’s approach is even less restrained in another sense: It would effect a major break from our case law outside of the “incorporation” area. Justice Scalia does not seem troubled by the fact that his method is largely inconsistent with the Court’s canonical substantive due process decisions, ranging from Meyer, 262 U. S. 390, and Pierce, 268 U. S. 510, in the 1920’s, to Griswold, 381 U. S. 479, in the 1960’s, to Lawrence, 539 U. S. 558, in the 2000’s. To the contrary, he seems to embrace this dissonance. My method seeks to synthesize dozens of cases on which the American people have relied for decades. Justice Scalia’s method seeks to vaporize them. So I am left to wonder, which of us is more faithful to this Nation’s constitutional history? And which of us is more faithful to the values and commitments of the American people, as they stand today? In 1967, when the Court held in Loving, 388 U. S. 1, that adults have a liberty-based as well as equality-based right to wed persons of another race, interracial marriage was hardly “deeply rooted” in American tradition. Racial segregation and subordination were deeply rooted. The Court’s substantive due process holding was nonetheless correct — and we should be wary of any interpretive theory that implies, emphatically, that it was not.
Which leads me to the final set of points I wish to make: Justice Scalia’s method invites not only bad history, but also bad constitutional law. As I have already explained, in evaluating a claimed liberty interest (or any constitutional claim for that matter), it makes perfect sense to give history significant weight: Justice Scalia’s position is closer to my own than he apparently feels comfortable acknowledging. But it makes little sense to give history dispositive weight in every case. And it makes especially little sense to answer questions like whether the right to bear arms is “fundamental” by focusing only on the past, given that both the practical significance and the public understandings of such a right often change as society changes. What if the evidence had *910 shown that, whereas at one time firearm possession contributed, substantially to personal liberty and safety, nowadays it contributes nothing, or even tends to undermine them? Would it still have been reasonable to constitutionalize the right?
The concern runs still deeper. Not only can historical views be less than completely clear or informative, but they can also be wrong. Some notions that many Americans deeply believed to be true, at one time, turned out not to be true. Some practices that many Americans believed to be consistent with the Constitution’s guarantees of liberty and equality, at one time, turned out to be inconsistent with them. The fact that we have a written Constitution does not consign this Nation to a static legal existence. Although we should always “pa[y] a decent regard to the opinions of former times,” it is “not the glory of the people of America” to have “suffered a blind veneration for antiquity.” The Federalist No. 14, pp. 99, 104 (C. Rossiter ed. 1961) (J. Madison). It is not the role of federal judges to be amateur historians. And it is not fidelity to the Constitution to ignore its use of deliberately capacious language, in an effort to transform foundational legal commitments into narrow rules of decision.
As for “the democratic process,” ante, at 804,805, a method that looks exclusively to history can easily do more harm than good. Just consider this case. The net result of Justice Scalia’s supposedly objective analysis is to vest federal judges — ultimately a majority of the judges on this Court— with unprecedented lawmaking powers in an area in which they have no special qualifications, and in which the give- and-take of the political process has functioned effectively for decades. Why this “intrudes much less upon the democratic process,” ante, at 804, than an approach that would defer to the democratic process on the regulation of firearms is, to say the least, not self-evident. I cannot even tell what, under Justice Scalia’s view, constitutes an “intrusion.”
*911 It is worth pondering, furthermore, the vision of democracy that underlies Justice Scalia’s critique. Very few of us would welcome a system in which majorities or powerful interest groups always get their way. Under our constitutional scheme, I would have thought that a judicial approach to liberty claims such as the one I have outlined — an approach that investigates both the intrinsic nature of the claimed interest and the practical significance of its judicial enforcement, that is transparent in its reasoning and sincere in its effort to incorporate constraints, that is guided by history but not beholden to it, and that is willing to protect some rights even if they have not already received uniform protection from the elected branches — has the capacity to improve, rather than “[imjperil,” ante, at 805, our democracy. It all depends on judges’ exercising careful, reasoned judgment. As it always has, and as it always will.
VII
The fact that the right to keep and bear arms appears in the Constitution should not obscure the novelty of the Court’s decision to enforce that right against the States. By its terms, the Second Amendment does not apply to the States; read properly, it does not even apply to individuals outside of the militia context. The Second Amendment was adopted to protect the States fromj federal encroachment. And the Fourteenth Amendment has never been understood by the Court to have “incorporated” the entire Bill of Rights. There was nothing foreordained about today’s outcome.
Although the Court’s decision in this case might be seen as a mere adjunct to its decision in Heller, the consequences could prove far more destructive — quite literally — to our Nation’s communities and to our constitutional structure. Thankfully, the Second Amendment right identified in Heller and its newly minted Fourteenth Amendment analogue are limited, at least for now, to the home. But neither the “assurances” provided by the plurality, ante, at 786, nor the *912 many historical sources cited in its opinion should obscure the reality that today’s ruling marks a dramatic change in our law — or that the Justices who have joined it have brought to bear an awesome amount of discretion in resolving the legal question presented by this case.
I would proceed more cautiously. For the reasons set out at length above, I cannot accept either the methodology the Court employs or the conclusions it draws. Although impressively argued, the majority’s decision to overturn more than a century of Supreme Court precedent and to unsettle a much longer tradition of state practice is not, in my judgment, built “upon respect for the teachings of history, solid recognition of the basic values that underlie our society, and wise appreciation of the great roles that the doctrines of federalism and separation of powers have played in establishing and preserving American freedoms.” Griswold, 381 U. S., at 501 (Harlan, J., concurring in judgment).
Accordingly, I respectfully dissent.

 See United States v. Cruikshank, 92 U. S. 542, 553 (1876); Presser v. Illinois, 116 U. S. 252, 265 (1886); Miller v. Texas, 153 U. S. 535, 538 (1894). This is not to say that I agree with all other aspects of these decisions.

 Cf., e. g., Currie, The Reconstruction Congress, 75 U. Chi. L. Rev. 383, 406 (2008) (finding “some support in the legislative history for no fewer than four interpretations” of the Privileges or Immunities Clause, two of which contradict petitioners’ submission); Green, The Original Sense of the (Equal) Protection Clause: Subsequent Interpretation and Application, 19 Geo. Mason U. Civ. Rights L. J. 219, 255-277 (2009) (providing evidence that the Clause was originally conceived of as an antidiscrimination measure, guaranteeing equal rights for black citizens); Rosenthal, The New Originalism Meets the Fourteenth Amendment: Original Public Meaning and the Problem of Incorporation, 18 J. Contemp. Legal Issues 361 (2009) (detailing reasons to doubt that the Clause was originally understood to apply the Bill of Rights to the States); Hamburger, Privileges or Immunities, 105 Nw. U. L. Rev. 61 (2011) (arguing that the Clause was meant to ensure freed slaves were afforded “the Privileges and Immunities” speci *860 fied in Article IV, § 2, cl. 1, of the Constitution). Although he urges its elevation in our doctrine, Justice Thomas has acknowledged that, in seeking to ascertain the original meaning of the Privileges or Immunities Clause, “[l]egal scholars agree on little beyond the conclusion that the Clause does not mean what the Court said it meant in 1873.” Saenz v. Roe, 526 U. S. 489, 522, n. 1 (1999) (dissenting opinion); accord, ante, at 758 (plurality opinion).

 It is no secret that the desire to “displace” major “portions of our equal protection and substantive due process jurisprudence” animates some of the passion that attends this interpretive issue. Saenz, 526 U. S., at 528 (Thomas, J., dissenting).

 Wilkinson, The Fourteenth Amendment Privileges or Immunities Clause, 12 Harv. J. L. & Pub. Pol’y 43, 52 (1989). Judge Wilkinson’s point is broader than the privileges or immunities debate. As he observes, “there may be more structure imposed by provisions subject to generations of elaboration and refinement than by a provision in its pristine state. The fortuities of uneven constitutional development must be respected, not cast aside in the illusion of reordering the landscape anew.” Id., at 51-52; see also Washington v. Glucksberg, 521 U. S. 702, 759, n. 6 (1997) (Souter, J., concurring in judgment) (acknowledging that, “[t]o a degree,” the Slaughter-House “decision may have led the Court to look to the Due Process Clause as a source of substantive rights”).

 See, e. g., Ely, The Oxymoron Reconsidered: Myth and Reality in the Origins of Substantive Due Process, 16 Const. Commentary 315, 326-327 (1999) (concluding that founding-era “American statesmen accustomed to viewing due process through the lens of [Sir Edward] Coke and [William] Blackstone could [not] have failed to understand due process as encompassing substantive as well as procedural terms”); Gedicks, An Originalist Defense of Substantive Due Process: Magna Carta, Higher-Law Constitutionalism, and the Fifth Amendment, 58 Emory L. J. 585, 594 (2009) (arguing “that one widely shared understanding of the Due Process Clause of the Fifth Amendment in the late eighteenth century encompassed judicial recognition and enforcement of unenumerated substantive rights”); Maltz, Fourteenth Amendment Concepts in the Antebellum Era, 32 Am. J. Legal Hist. 305, 317-318 (1988) (explaining that in the antebellum era a “substantial number of states,” as well as antislavery advocates, “imbued their [constitutions’] respective due process clauses with a substantive content”); Tribe, Taking Text and Structure Seriously: Reflections on Free-Form Method in Constitutional Interpretation, 108 Harv. L. Rev. 1221, 1297, n. 247 (1995) (“[T]he historical evidence points strongly toward the conclusion that, at least by 1868 even if not in 1791, any state legislature voting to ratify a constitutional rule banning government deprivations of ‘life, liberty, or property, without due process of law* would have understood that ban as having substantive as well as procedural content, given that era’s premise that, to qualify as ‘law,’ an enactment would have to meet substantive requirements of rationality, non-oppressiveness, and evenhandedness”); see also Stevens, The Third Branch of Liberty, 41 U. Miami L. Rev. 277, 290 (1986) (“In view of the number of eases that have given substantive content to the term liberty, the burden of demonstrating that this consistent course of decision was unfaithful to the intent of the Framers is surely a heavy one”).

 1 L. Tribe, American Constitutional Law §8-1, p. 1335 (3d ed. 2000).

 The Ninth Amendment provides: “The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.”

 Stevens, The Bill of Rights: A Century of Progress, 59 U. Chi. L. Rev. 13, 20 (1992); see Fitzgerald, 523 F. 2d, at 719-720; Stevens, 41 U. Miami L. Rev., at 286-289; see also Greene, The So-Called Right to Privacy, 43 U. C. D. L. Rev. 715, 725-731 (2010).

 See also Gitlow, 268 U. S., at 672 (Holmes, J., dissenting) (“The general principle of free speech, it seems to me, must be taken to be included in the Fourteenth Amendment, in view of the scope that has been given to the word ‘liberty’ as there used, although perhaps it may be accepted with a somewhat larger latitude of interpretation than is allowed to Congress by the sweeping language that governs or ought to govern the laws of the United States”). Subsequent decisions repeatedly reaffirmed that persons hold free speech rights against the States on account of the Fourteenth Amendment’s liberty clause, not the First Amendment per se. See, e. g., NAACP v. Alabama ex rel. Patterson, 357 U. S. 449, 460, 466 (1958); Cantwell v. Connecticut, 310 U. S. 296, 303 (1940); Thornhill v. Alabama, 310 U. S. 88, 95, and n. 7 (1940); see also McIntyre v. Ohio Elections Comm’n, 514 U. S. 334, 336, n. 1 (1995) (“The term ‘liberty in the Fourteenth Amendment to the Constitution makes the First Amendment applicable to the States”). Classic opinions written by Justice Cardozo and Justice Frankfurter endorsed the same basic approach to “incorporation,” with the Fourteenth Amendment taken as a distinct source of rights *866 independent from the first eight Amendments. Palko v. Connecticut, 302 U. S. 319, 322-328 (1937) (opinion for the Court by Cardozo, J.); Adamson v. California, 332 U. S. 46, 59-68 (1947) (Frankfurter, J., concurring).

 See also Wolf v. Colorado, 338 U. S. 25, 26 (1949) (“The notion that the ‘due process of law' guaranteed by the Fourteenth Amendment is shorthand for the first eight amendments of the Constitution ... has been rejected by this Court again and again, after impressive consideration____ The issue is closed”). Wolf’s holding on the exclusionary rule was overruled by Mapp v. Ohio, 367 U. S. 643 (1961), but the principle just quoted has never been disturbed. It is notable that Mapp, the case that launched the modern “doctrine of ad hoc,” “ ‘jot-for-jot’ ” incorporation, Williams v. Florida, 399 U. S. 78, 130-131 (1970) (Harlan, J., concurring in result), expressly held “that the exclusionary rule is an essential part of both the Fourth and Fourteenth Amendments.” 367 U. S., at 657 (emphasis added).

 I can hardly improve upon the many passionate defenses of this position that Justice Harlan penned during his tenure on the Court. See Williams, 399 U. S., at 131, n. 14 (opinion concurring in result) (cataloging opinions).

 See, e. g., Pet. for Cert, in Bowen v. Oregon, O. T. 2009, No. 08-1117, p. i, cert. denied, 558 U. S. 815 (2009) (request to overrule Apodaca)', Pet. for Cert. in Lee v. Louisiana, O. T. 2008, No. 07-1523, p. i, cert. denied, 555 U. S. 823 (2008) (same); Pet. for Cert. in Logan v. Florida, O. T. 2007, No. 07-7264, pp. 14-19, cert. denied, 552 U. S. 1189 (2008) (request to overrule Williams).

 The vast majority of States already recognize a right to keep and bear arms in their own constitutions, see Volokh, State Constitutional Rights To Keep and Bear Arms, 11 Tex. Rev. L. & Polities 191 (2006) (cataloging provisions); Brief for Petitioners 69 (observing that “[t]hese Second Amendment analogs are effective and consequential”), but the States vary widely in their regulatory schemes, their traditions and cultures of firearm use, and their problems relating to gun violence. If federal and state courts must harmonize their review of gun-control laws under the Second Amendment, the resulting jurisprudence may prove significantly more deferential to those laws than the status quo ante. Once it has been established that a single legal standard must govern nationwide, federal courts will face a profound pressure to reconcile that standard with the diverse interests of the States and their long history of regulating in this sensitive area. Cf. Williams, 399 U. S., at 129-130 (Harlan, I, concurring in result) (noting “ ‘backlash’ ” potential of jot-for-jot incorporation); Grant, Felix Frankfurter: A Dissenting Opinion, 12 UCLA L. Rev. 1013, 1038 (1965) (“If the Court will not reduce the requirements of the fourteenth amendment below the federal gloss that now overlays the Bill of Rights, then it "will have to reduce that gloss to the point where the states can *871 live with it”). Amici argue persuasively that, post-“incorporation,” federal courts will have little choice but to fix a highly flexible standard of review if they are to avoid leaving federalism and the separation of powers — not to mention gun policy — in shambles. See Brief for Brady Center to Prevent Gun Violence et al. (hereinafter Brady Center Brief).

 Justice Cardozo’s test itself built upon an older line of decisions. See, e. g., Chicago, B. & Q. R. Co. v. Chicago, 166 U. S. 226, 237 (1897) (discussing “limitations on [state] power which grow out of the essential nature of all free governments [and] implied reservations of individual rights, . . . and which are respected by all governments entitled to the name” (internal quotation marks omitted)).

 See Palko, 302 U. S., at 326, n. 3; see also, e. g., Lawrence v. Texas, 539 U. S. 558, 572-573, 576-577 (2003); Glucksberg, 521 U. S., at 710-711, and n. 8.

 1 acknowledge that some have read the Court’s opinion in Glucksberg as an attempt to move substantive due process analysis, for all purposes, toward an exclusively historical methodology — and thereby to debilitate the doctrine. If that were ever Glucksberg’s aspiration, Laivrence plainly renounced it. As between Glucksberg and Lawrence, I have little doubt which will prove the more enduring precedent.

 The Court almost never asked whether the guarantee in question was deeply rooted in founding-era practice. See Brief for Respondent City of Chicago et al. 31, n. 17 (hereinafter Municipal Respondents’ Brief) (noting that only two opinions extensively discussed such history).

 Cf. Robinson v. California, 370 U. S. 660, 666-668 (1962) (invalidating state statute criminalizing narcotics addiction as “cruel and unusual punishment in violation of the Fourteenth Amendment” based on nature of the alleged “ ‘crime,’ ” without historical analysis); Brief for Respondent National Rifle Association of America, Inc., et al. 29 (noting that “lynehpin” of incorporation test has always been “the importance of the right in question to . . . ‘liberty’ ” and to our “system of government”).

 I do not mean to denigrate this function, or to imply that only “new rights” — whatever one takes that term to mean — ought to “get in” the substantive due process door. Ante, at 795 (Scaeia, J., concurring).

 See Bowers v. Hardwick, 478 U. S. 186, 199 (1986) (Blackmun, J., dissenting) (“Like Justice Holmes, I believe that ‘[i]t is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past’ ” (quoting Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 469 (1897))).

 Justice Kennedy has made the point movingly:
“Had those who drew and ratified the Due Process Clauses of the Fifth Amendment or the Fourteenth Amendment known the components of liberty in its manifold possibilities, they might have been more specific. They did not presume to have this insight. They knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom.” Lawrence, 539 U. S., at 578-579.

 Contrary to Justice Scalia’s suggestion, I emphatically do not believe that “only we judges” can interpret the Fourteenth Amendment, ante, at 794, or any other constitutional provision. All Americans can; all Americans should. I emphatically do believe that we judges must exercise — indeed, cannot help but exercise — our own reasoned judgment in so doing. Justice Scalia and I are on common ground in maintaining that courts should be “guided by what the American people throughout our history have thought.” Ibid. Where we part ways is in his view that courts should be guided only by historical considerations.
There is, moreover, a tension between Justice Scalia’s concern that “courts have the last word” on constitutional questions, ante, at 794, n. 2, on the one hand, and his touting of the Constitution’s Article V amendment process, ante, at 793-794, on the other. The American people can of course reverse this Court’s rulings through that same process.

 In assessing concerns about the “open-ended[ness]” of this area of law, Collins, 503 U. S., at 125, one does well to keep in view the malleability not only of the Court’s “deeply rooted’Vfundamentality standard but also of substantive due process’ constitutional cousin, “equal protection” analysis. Substantive due process is sometimes accused of entailing an insufficiently “restrained methodology.” Glucksberg, 521 U. S., at 721. Yet “the word ‘liberty’ in the Due Process Clause seems to provide at least as much meaningful guidance as does the word ‘equal’ in the Equal Protection Clause.” Post, The Supreme Court 2002 Term — Foreword: Fashioning the Legal Constitution: Culture, Courts, and Law, 117 Harv. L. Rev. 4, 94, n. 440 (2003). And “[i]f the objection is instead that the text of the [Due Process] Clause warrants providing only protections of process rather than protections of substance,” “it is striking that even those Justices who are most theoretically opposed to substantive due process, like Scalia and Rehnquist, are also nonetheless enthusiastic about applying the equal protection component of the Due Process Clause of the Fifth Amendment to the federal government.” Ibid, (citing Adarand Constructors, Inc. v. Peña, 515 U. S. 200, 213-231 (1995)).

 That one eschews a comprehensive theory of liberty does not, pace Justice Scalia, mean that one lacks “a coherent theory of the Due Process Clause,” ante, at 795. It means that one lacks the hubris to adopt a rigid, context-independent definition of a constitutional guarantee that was deliberately framed in open-ended terms.

The notion that we should define liberty claims at the most specific level available is one of Justice Scalia’s signal contributions to the theory of substantive due process. See, e. g., Michael H. v. Gerald D., 491 U. S. 110, 127-128, n. 6 (1989) (opinion of Scalia, J.); ante, at 797 (Scalia, J., concurring). By so narrowing the asserted right, this approach “loads the dice” against its recognition, Roosevelt, Forget the Fundamentals: Fixing Substantive Due Process, 8 U. Pa. J. Const. L. 983, 1002, n. 73 (2006): When one defines the liberty interest at issue in Lawrence as the freedom to perform specific sex acts, ante, at 792, the interest starts to look less compelling. The Court today does not follow Justice Scalia’s “particularizing” method, Katzenbach v. Morgan, 384 U. S. 641, 649 (1966), as it relies on general historical references to keeping and bearing arms, without any close study of the States’ practice of regulating especially dangerous weapons.

 In District of Columbia v. Heller, 554 U. S. 570, 595 (2008), the Court concluded, over my dissent, that the Second Amendment confers “an individual right to keep and bear arms” disconnected from militia service. If that conclusion were wrong, then petitioners’ “incorporation” claim clearly would fail, as they would hold no right against the Federal Government to be free from regulations such as the ones they challenge. Cf. post, at 919 (Breyer, J., dissenting). I do not understand petitioners or any of their amici to dispute this point. Yet even if Heller had never been decided— indeed, even if the Second Amendment did not exist — we would still have an obligation to address petitioners’ Fourteenth Amendment claim.

 The village of Oak Park imposes more stringent restrictions that may raise additional complications. See ante, at 750 (majority opinion) (quoting Oak Park, Ill., Village Code §§27-2-1 (2007), 27-1-1 (2009)). The Court, however, declined to grant certiorari on the National Rifle Association’s challenge to the Oak Park restrictions. Chicago is the only defendant in this case.

 To the extent that petitioners contend the city of Chicago’s registration requirements for firearm possessors also, and separately, violate the Constitution, that claim borders on the frivolous. Petitioners make no effort to demonstrate that the requirements are unreasonable or that they impose a severe burden on the underlying right they have asserted.

 Members of my generation, at least, will recall the many passionate statements of this view made by the distinguished actor, Charlton Heston.

 See Municipal Respondents’ Brief 20, n. 11 (stating that at least 156 Second Amendment challenges were brought in time between Heller’s issuance and brief’s filing); Brady Center Brief 3 (stating that over 190 Second Amendment challenges were brought in first 18 months since Heller); Brief for Villages of Winnetka and Skokie, Illinois, et al. as Amici Curiae 15 (stating that, in wake of Heller, municipalities have “repealed longstanding handgun laws to avoid costly litigation”).

 See, e. g., Brief for Professors of Philosophy etc.; Brief for International Law Enforcement Educators and Trainers Association et al. 29-45; Brief for Thirty-four California District Attorneys et al. 12-31.

 The argument that this Court should establish any such right, however, faces steep hurdles. All 50 States already recognize self-defense as a defense to criminal prosecution, see 2 P. Robinson, Criminal Law Defenses § 132 (1984 and Supp. 2009), so this is hardly an interest to which the democratic process has been insensitive. And the States have always diverged on how exactly to implement this interest, so there is wide variety across the Nation in the types and amounts of force that may be used, the necessity of retreat, the rights of aggressors, the availability of the “castle doctrine,” and so forth. See Brief for Oak Park Citizens Committee for Handgun Control as Amicus Curiae 9-21; Brief for American Cities et al. as Amici Curiae 17-19; 2 W. LaFave, Substantive Criminal Law §10.4, pp. 142-160 (2d ed. 2003). Such variation is presumed to be a healthy part of our federalist system, as the States and localities select different rules in light of different priorities, customs, and conditions.
As a historical and theoretical matter, moreover, the legal status of self-defense is far more complicated than it might first appear. We have generally understood Fourteenth Amendment “liberty” as something one holds against direct state interference, whereas a personal right of self-defense runs primarily against other individuals; absent government tyranny, it is only when the State has failed to interfere with (violent) private conduct that self-help becomes potentially necessary. Moreover, it was a basic tenet of founding-era political philosophy that, in entering civil society and gaining “the advantages of mutual commerce” and the protections of the rule of law, one had to relinquish, to a significant degree, “that wild and savage liberty” one possessed in the state of nature. 1W. Blackstone, *889 Commentaries *125; see also, e. g., J. Locke, Second Treatise of Civil Government § 128, pp. 63-64 (J. Gough ed. 1947) (in state of nature man has power “to do whatever he thinks fit for the preservation of himself and others,” but this “he gives up when he joins in a . . . particular political society”); Green v. Biddle, 8 Wheat. 1, 63 (1823) (argument for defendant) (“It is a trite maxim, that man gives up a part of his natural liberty when he enters into civil society, as the price of the blessings of that state: and it may be said, with truth, this liberty is well exchanged for the advantages which flow from law and justice”). Some strains of founding-era thought took a very narrow view of the right to armed self-defense. See, e. g., Brief for Historians on Early American Legal, Constitutional and Pennsylvania History as Amici Curiae 6-13 (discussing Whig and Quaker theories). Just because there may be a natural or common-law right to some measure of self-defense, it hardly follows that States may not place substantial restrictions on its exercise or that this Court should recognize a constitutional right to the same.

 The Second Amendment right identified in Heller is likewise clearly distinct from a right to protect oneself. In my view, .the Court badly misconstrued the Second Amendment in linking it to the value of personal self-defense above and beyond the functioning of the state militias; as enacted, the Second Amendment was concerned with tyrants and invaders, and paradigmatieally with the federal military, not with criminals and intruders. But even still, the Court made clear that self-defense plays a limited role in determining the scope and substance of the Amendment’s guarantee. The Court struck down the District of Columbia’s handgun ban not because of the utility of handguns for lawful self-defense, but rather because of their popularity for that purpose. See 554 U. S., at 629. And the Court’s common-use gloss on the Second Amendment right, see id., at 627, as well as its discussion of permissible limitations on the right, id., at 626-628, had little to do with self-defense.

 Brady Center Brief 11 (extrapolating from Government statistics); see also Brief for American Public Health Association et al. as Amici Curiae 6-7 (reporting estimated social cost of firearm-related violence of $100 billion per year).

 Bogus, Gun Control and America’s Cities: Public Policy and Polities, 1 Albany Govt. L. Rev. 440, 447 (2008) (drawing on Federal Bureau of Investigation data); see also Heller, 554 U. S., at 697-698 (Breyer, J., dissenting) (providing additional statistics on handgun violence); Municipal Respondents’ Brief 13-14 (same).

 Justice Scaua worries that there is no “objective” way to decide what is essential to a “liberty-filled” existence: Better, then, to ignore such messy considerations as how an interest actually affects people’s lives. Ante, at 800. Both the constitutional text and our cases use the term “liberty,” however, and liberty is not a purely objective concept. Substantive due process analysis does not require any “political” judgment, ibid. It does require some amount of practical and normative judgment. The only way to assess what is essential to fulfilling the Constitution’s guarantee of “liberty,” in the present day, is to provide reasons that apply to the *894 present day. I have provided many; Justice Scalia and the Court have provided virtually none.
Justice Scalia also misstates my argument when he refers to “the right to keep and bear arms,” without qualification. Ante, at 799. That is what the Second Amendment protects against Federal Government infringement. I have taken pains to show why the Fourteenth Amendment liberty interest asserted by petitioners — the interest in keeping a firearm of one’s choosing in the home — is not necessarily coextensive with the Second Amendment right.

 It has not escaped my attention that the Due Process Clause refers to “property” as well as “liberty.” Cf. ante, at 792, n. 1, 799-800, n. 6 (opinion of Scalia, J.). Indeed, in Moore v. East Cleveland, 431 U. S. 494 (1977), I alone viewed “the critical question” as “whether East Cleveland’s housing ordinance [was] a permissible restriction on appellant’s right to use her own property as she sees fit,” id., at 513 (opinion concurring in judgment). In that case, unlike in this case, the asserted property right was coextensive with a right to organize one’s family life, and I could find “no precedent” for the ordinance at issue, which “exclude[d] any of an owner’s relatives from the group of persons who may occupy his residence on a permanent basis.” Id., at 520. I am open to property claims under the Fourteenth Amendment. This case just involves a weak one. And ever since the Court “incorporated” the more specific property protections of the Takings Clause in 1897, see Chicago, B. & Q. R. Co., 166 U. S. 226, substantive due process doctrine has focused on liberty.

 Cf. Planned Parenthood of Southeastern Pa. v. Casey, 505 U. S. 833, 913-914 (1992) (Stevens, J., concurring in part and dissenting in part).

 The Second Amendment provides: “A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.”

 Contrary to Justice Scaua’s suggestion, this point is perfectly compatible with my opinion for the Court in Elk Grove Unified School Dist., 542 U. S. 1. Cf. ante, at 801. Like the Court itself, I have never agreed with Justice Thomas’ view that the Establishment Clause is a federalism provision. But I agree with his underlying logic: If a clause in the Bill of Rights exists to safeguard federalism interests, then it makes little sense to “incorporate” it. Justice Scaua’s further suggestion that I ought to have revisited the Establishment Clause debate in this opinion, ibid., is simply bizarre.

 See post, at 934-935 (Breyer, J., dissenting); Municipal Respondents’ Brief 62-69; Brief for Thirty-four Professional Historians and Legal Historians as Amici Curiae 22-26; Rosenthal, Second Amendment Plumbing After Heller: Of Standards of Scrutiny, Incorporation, Well-Regulated Militias, and Criminal Street Gangs, 41 Urb. Law. 1, 73-75 (2009). The plurality insists that the Reconstruction-era evidence shows the right to bear arms was regarded as “a substantive guarantee, not a prohibition that could be ignored so long as the States legislated in an evenhanded manner.” Ante, at 780. That may be so, but it does not resolve the question whether the Fourteenth Amendment’s Due Process Clause was originally understood to encompass a right to keep and bear arms, or whether it ought to be so construed now.

 I am unclear what the plurality means when it refers to “the paucity of precedent sustaining bans comparable to those at issue here.” Ante, at 786. There is only one ban at issue here — the city of Chicago’s handgun prohibition — and the municipal respondents cite far more than “one ease,” ibid., from the post-Reeonstruction period. See Municipal Respondents’ Brief 24-30. The evidence adduced by respondents and their amici easily establishes their contentions that the “consensus in States that recognize a firearms right is that arms possession, even in the home, is ... subject to interest-balancing,” id., at 24; and that the practice of “[b]anning weapons routinely used for self-defense,” when deemed “necessary for the public welfare,” “has ample historical pedigree,” id., at 28. Petitioners do not even try to challenge these contentions.

 I agree with Justice Scalia that a history of regulation hardly proves a right is not “of fundamental character. ” Ante, at 802. An unbroken history of extremely intensive, carefully considered regulation does, however, tend to suggest that it is not.

 The Heller majority asserted that “the adjective ‘well-regulated’” in the Second Amendment’s preamble “implies nothing more than the imposition of proper discipline and training.” 554 U. S., at 597. It is far from clear that this assertion is correct. See, e. g., U. S. Const., Art. I, §4, cl. 1; §8, els. 3, 5,14; §9, cl. 6; Art. III, §2, cl. 2; Art. IV, §2, cl. 3; §3, el. 2 (using “regulate” or “Regulation” in manner suggestive of broad, discretionary governmental authority); Art. I, § 8, cl. 16 (invoking powers of “disciplining” and “training” militia in manner suggestive of narrower authority); Heller, 554 U. S., at 579-581 (investigating Constitution’s separate references to “people” as clue to term’s meaning in Second Amendment); cf. Cornell & DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Ford. L. Rev. 487, 504 (2004) (“The authors of this curious interpretation of the Second Amendment have constructed a fantasy world where words mean their opposite, and regulation is really anti-regulation”). But even if the assertion were correct, the point would remain that the preamble envisions an active state role in overseeing how the right to keep and bear arms is utilized, and in ensuring that it is channeled toward productive ends.

 Cf. Heller, 554 U. S., at 698 (Breyer, J., dissenting) (detailing evidence showing that a “disproportionate amount of violent and property crimes occur in urban areas, and urban criminals are more likely than other offenders to use a firearm during the commission of a violent crime”).

 The fact that Chicago’s handgun murder rate may have “actually increased since the ban was enacted,” ante, at 751 (majority opinion), means virtually nothing in itself. Countless factors unrelated to the policy may have contributed to that trend. Without a sophisticated regression analysis, we cannot even begin to speculate as to the efficacy or effects of the handgun ban. Even with such an analysis, we could never be certain as to the determinants of the city’s murder rate.

 In some sense, it is no doubt true that the “ ‘best’ ” solution is elusive for many “serious social problems.” Ante, at 802 (opinion of Scaiia, J.). Yet few social problems have raised such heated empirical controversy as the problem of gun violence. And few, if any, of the liberty interests we have recognized under the Due Process Clause have raised as many complications for judicial oversight as the interest that is recognized today. See post, at 921-927.
I agree with the plurality that for a right to be eligible for substantive due process recognition, there need not be “a ‘popular consensus’ that the *904 right is fundamental.” Ante, at 789. In our remarkably diverse, pluralistic society, there will almost never be such uniformity of opinion. But to the extent that popular consensus is relevant, I do not agree with the plurality that the amicus brief filed in this case by numerous state attorneys general constitutes evidence thereof. Ibid. It is puzzling that so many state lawmakers have asked us to limit their option to regulate a dangerous item. Cf. post, at 920.

 Likewise, no one contends that those interested in personal self-defense — every American, presumably — face any particular disadvantage in the political process. All 50 States recognize self-defense as a defense to criminal prosecution. See n. 32, supra.

 See Heller, 554 U. S., at 662 (Stevens, J., dissenting) (“Although, it gives short shrift to the drafting history of the Second Amendment, the Court dwells at length on four other sources: the 17th-century English Bill of Rights; Blackstone’s Commentaries on the Laws of England; postenactment commentary on the Second Amendment; and post-Civil War legislative history”); see also post, at 914-916 (discussing professional historians’ criticisms of Heller).

 Indeed, this is truly one of our most deeply rooted legal traditions.